Filed 1/31/25  P. v. Crawley CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GILBERT CRAWLEY,<br><br>    Defendant and Appellant. | B330276<br><br>(Los Angeles County<br>Super. Ct. No. NA114789) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard M. Goul, Judge.  Affirmed.

Mary Jo Strnad, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael C. Keller and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant Gilbert Crawley guilty of the second degree murder of Archie Harris (Pen. Code, § 187, subd. (a))[1] and of possession of a firearm by a felon (§ 29800, subd. (a)(1)). On appeal, Crawley contends the trial court erred by denying his request for a jury instruction on involuntary intoxication. He further asserts that his trial counsel's conduct when requesting the instruction constituted ineffective assistance of counsel. Crawley also claims the trial court erred by admitting gang evidence. Finally, Crawley contends the trial court erred by imposing a sentence on the possession of firearm count that was prohibited by section 1170.1, and by failing to dismiss a firearm enhancement pursuant to section 1385, subdivision (c)(2). We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 28, 2020, Crawley shot and killed Archie Harris. The shooting was recorded by a surveillance camera. Video showed Crawley and Harris walking at 10:02 p.m. Crawley took a gun from his waistband, racked the slide, shot Harris once in the head and, after Harris fell to the ground, Crawley shot him twice more. Video also showed Crawley running away on foot. Law enforcement found a vial of phencyclidine (PCP) in Harris's hand. A toxicology report indicated Harris was under the influence of PCP when he died. Law enforcement also found a box of cigarettes and a lighter on the ground, just outside of Harris's pocket.

---

[1] All undesignated statutory references are to the Penal Code.

Harris and Crawley both grew up in Long Beach and were friends. Harris was associated with the Insane Crips gang, while Crawley was associated with the Rolling 20's Crips gang. There were several gangs in their neighborhood growing up, and members of the same family and friends were often in different gangs. At trial, Crawley admitted there was a "known rivalry" between the Insane Crips and the Rolling 20's Crips. However, Crawley and Harris never had any issues with each other, or any history of disagreements. Crawley moved away to Spokane, Washington, where there are other Rolling 20's Crips members, in approximately 2013. Crawley testified that as of June 2020, when he killed Harris, he was no longer "active" with the Rolling 20's Crips. He was 48 years old and had not been active in the gang since his early 30s.

On June 26 or 27, 2020, Crawley flew back to Long Beach to visit friends and family. He intended to visit a friend he considered a sister, his friend Daynara, and a man named "Little Goldie." Little Goldie is the brother of Ellis Spillman. Spillman was killed by a single gunshot to the head at 9:51 p.m. on June 28, 2018.[2] Spillman was a member of the Rolling 20's Crips. After Harris's murder, a friend of Crawley's, Mark Morton, told a Long Beach Police Department officer that Crawley had returned to Long Beach for a funeral or gathering honoring Spillman's death.

The first night Crawley returned to Long Beach, he stayed with Cory Hunter, a Rolling 20's Crips member. Hunter loaned Crawley a gun for protection. Crawley testified that he had the

---

[2]     At the time of trial, law enforcement had not solved Spillman's murder.

gun with him on June 28, 2020, because he had heard that a Hispanic gang in Long Beach was targeting Black people.

On the morning of June 28, 2020, Raynell Young, Harris's cousin and Crawley's old friend, was driving in Long Beach. Young had been a Rolling 20's Crips gang member. While driving, Young noticed Crawley. He stopped and picked Crawley up. They bought alcohol and went to Young's house to drink and hang out.

While at Young's house, Crawley took a shower and put on a yellow and black t-shirt with the Pittsburgh Steelers logo on it and names of Rolling 20's Crips members who had died on the back. Crawley had gotten it the night before from a friend who sells Long Beach memorabilia. Crawley testified that black and gold colors and the Pittsburgh Steelers logo are associated with the Rolling 20's Crips.

Crawley and Young left to visit Spillman's father. Spillman had been their "good friend." The father did not have a "big memorial" for Spillman; Crawley and Young just stopped by to pay their respects. Morton was at Young's apartment at the time. He remembered that before they left, Crawley and Young mentioned that it was the anniversary of Spillman's murder.

After visiting Spillman's father, Crawley and Young went to a park to talk to younger gang members. Next, they went to a street to drink and hang out with old friends, which included people affiliated with the Rolling 20's Crips.

Crawley and Young returned to Young's apartment around 8:30 or 9:00 p.m. Harris was at the apartment, and he and Crawley hugged and shook hands. Crawley was happy to see Harris because they were friends and had not seen each other for a long time. Morton was also at the apartment. He testified that

4

Crawley and Harris were happy to see each other. Crawley, Young, Harris, and Morton did not argue; everyone "greeted each other in good friendship."

Harris and Crawley decided to go to the store together. According to Crawley, going to the store was Harris's idea. Crawley borrowed a blue jacket to cover his yellow and black Rolling 20's Crips shirt because he did not want people to "gang bang" on him. Harris was wearing a jacket with a Raider's logo, a team associated with the Insane Crips.

Crawley testified that before they left, Harris asked if Crawley " 'still smoke[d],' " which Crawley took to refer to smoking marijuana. He said that he did. Harris passed Crawley something the size of half a blunt or a cigarette, about four inches long. When Crawley inhaled it, he experienced a "real funny," "chemically" taste, which he did not recognize to be marijuana. When Crawley remarked that it was not marijuana, Harris was laughing and made a comment but Crawley was not sure what he said. Crawley knew it was PCP because he had known people who used PCP in the past. However, he had not seen PCP since the 1980's or 1990's. By 2020, PCP use was not common among Crawley's friends, and he had never used it.

Neither Young nor Morton saw Crawley smoke anything at Young's house. Around five minutes after Crawley and Harris left the house, Young and Morton heard gunshots.

Crawley testified he did not remember anything from the remainder of June 28, 2020. The next thing he recalled was waking up at a friend's house the following day. At trial, Crawley admitted that the surveillance video showed him shooting Harris, but he testified that he did not remember doing so and did not want to shoot Harris because he was a friend. Crawley's cell

phone records from June 28, 2020, indicated that his phone was powered off, in airplane mode, or without cell service from approximately 9:45 p.m. until 10:13 p.m.  No similar half-hour gap occurred that day.

On June 29, 2020, Crawley was arrested for Harris's murder.  The police found him in his friend Daynara's car.  Daynara was wearing a Pittsburgh Steelers jersey and socks, in black and gold.  The police also found the t-shirt Crawley had been wearing when he shot Harris.

### *Expert Testimony*

At the time of trial, Officer Sean Magee had worked for the Long Beach Police Department for almost 19 years.  He spent eight years working on gang detail and gang-related work through the counterterrorism unit.  Through his work, he is familiar with the Rolling 20's Crips and the Insane Crips.  Their rivalry has been "constant" since the mid-to-late 1980's.  It was ongoing at the time of trial.

Despite the rivalry, there is crossover within families because both gangs originate from the same street in Long Beach.  However, the gang "becomes your family" and being family does not give rivals a "pass."  The primary loyalty is to the gang and the "enemy" is the rival gang.

The anniversary of the death of a gang member can be significant to the remaining members.  These anniversaries are commemorated with vigils and visits to the location where the person died, and with t-shirts in memory of deceased members.  Gangs also kill members of rival gangs on anniversary dates.

This sends a message to the rival gang that "this is tit for tat, this is an eye for an eye, we will get our revenge."

The colors black and yellow or gold are associated with the Rolling 20's Crips, as are the team logos for the Pittsburgh Steelers and the Pirates. The Insane Crips wear silver and black, and they identify with the Raiders logo.

In addition to Long Beach, Rolling 20's Crips members also reside in other areas of the United States, including Spokane. At one point, the "gang problem became so bad" in Spokane that some of its law enforcement officers visited Long Beach to learn from its gang unit about the city's gangs, like the Rolling 20's Crips. Gang members are known to travel to other parts of the country to commit crimes and evade detection from local police. Magee testified that during the course of his investigations, he had found suspects traveling between Washington and Long Beach, "or committing crimes in both Spokane and Long Beach."

A defense medical expert testified that PCP may cause blackouts, delusions, hallucinations, and violent behavior. The effects of PCP can begin within two to five minutes of consumption, and they peak within one hour. In reviewing the surveillance video, the expert did not see overt symptoms of PCP use in Harris or Crawley.

***The Trial Proceedings***

The People charged Crawley by information with the murder of Harris (§ 187, subd. (a); count 1) and with one count of possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2). The information also alleged that in the commission of the murder, Crawley personally used a firearm within the meaning of section 12022.5, subdivision (a).

7

In February and March 2023, Crawley was tried by jury. Crawley moved to exclude all gang evidence pursuant to Evidence Code section 352. The trial court denied the motion. The People asked the jury to find Crawley guilty of first degree murder. The jury found Crawley guilty of the second degree murder of Harris and found true the allegation that Crawley personally used a firearm in the commission of the murder. The jury further found Crawley guilty of possession of a firearm by a felon.

The trial court imposed a sentence of 25 years to life plus 2 years in state prison. The sentence consisted of a term of 15 years to life on count 1, plus an additional 10 years for the firearm enhancement. On count 2, the court imposed a consecutive midterm sentence of two years.

Crawley timely appealed.

## DISCUSSION

### I. The Trial Court's Denial of the Defense Request for an Involuntary Intoxication Instruction Was Harmless and Did Not Violate Crawley's Constitutional Rights

On appeal, Crawley challenges the trial court's ruling denying a defense request for a jury instruction on involuntary intoxication. We conclude that any error was harmless.

#### A. Background

Defense counsel requested jury instructions on involuntary intoxication, CALCRIM No. 3427, and unconsciousness, CALCRIM No. 3425.[3] Relying on *People v. Velez* (1985) 175

---

[3] CALCRIM No. 3427, "Involuntary Intoxication," provides:

8

Cal.App.3d 785 (*Velez*), the prosecutor objected to any instruction on involuntary intoxication. In *Velez*, the court held the trial court properly denied a request for an involuntary intoxication instruction where the evidence indicated the defendant voluntarily smoked marijuana, unaware that it was laced with PCP. Defense counsel argued *Velez* was no longer controlling as it was decided before marijuana use became legal in California.

The trial court rejected defense counsel's requests in favor of a voluntary intoxication instruction, CALCRIM No. 626.

CALCRIM No. 626, "Voluntary Intoxication Causing Unconsciousness: Effects on Homicide Crimes" as given to the jury stated:

> "Voluntary intoxication may cause a person to be unconscious of his or her actions. . . .
>
> [¶] . . . [¶]

---

> "Consider any evidence that the defendant was involuntarily intoxicated in deciding whether the defendant had the required (intent/ [or] mental state) when (he/she) acted.
>
> "A person is *involuntarily intoxicated* if he or she unknowingly ingested some intoxicating liquor, drug, or other substance, or if his or her intoxication is caused by the (force/[,] [or] duress/[,] [or] fraud/[,] [or] trickery) of someone else, for whatever purpose[, without any fault on the part of the intoxicated person]."

CALCRIM No. 3425 states in relevant part that "[t]he defense of unconsciousness may not be based on voluntary intoxication." Crawley does not contend the trial court erred in failing to give CALCRIM No. 3425.

9

"When a person voluntarily causes his or her own intoxication to the point of unconsciousness, the person assumes the risk that while unconscious he or she will commit acts inherently dangerous to human life. If someone dies as a result of the actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter.

"Involuntary manslaughter has been proved if you find beyond a reasonable doubt that:

"1. The defendant killed without legal justification or excuse;
2. The defendant did not act with the intent to kill;
3. The defendant did not act with a conscious disregard for human life;
AND
4. As a result of voluntary intoxication, the defendant was not conscious of (his/her) actions or the nature of those actions.

"The People have the burden of proving beyond a reasonable doubt that the defendant was not unconscious. If the People have not met this burden, you must find the defendant not guilty of murder."

## B.    Any error was not reversible per se

Crawley argues the trial court's error in refusing to instruct the jury on involuntary intoxication is structural error and therefore reversible per se. We disagree.

Whether an error is considered reversible per se or reviewed under a harmless error standard depends on the type of error. (See *People v. Gonzalez* (2018) 5 Cal.5th 186, 196 (*Gonzalez*).) "Structural errors" are reversible per se and differ from "trial errors" that are subject to the harmless error

10

standard. "[T]rial errors can be fairly examined in the context of the entire record and are amenable to harmless error review. Structural errors, on the other hand, go to the very reliability of a criminal trial as a vehicle for determining guilt or innocence and are reversible per se." (*People v. Anzalone* (2013) 56 Cal.4th 545, 554 (*Anzalone*).)

Structural error is the " 'exception and not the rule,' " and there is a strong presumption that error is susceptible to harmless error analysis. (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 178; *People v. Mil* (2012) 53 Cal.4th 400, 410 (*Mil*) [listing " ' "very limited" ' " class of cases constituting structural error and thus subject to automatic reversal].) Even " 'most constitutional errors can be harmless.' [Citation.]" (*Neder v. United States* (1999) 527 U.S. 1, 8 [structural error applies in a very limited class of cases, including complete denial of counsel, biased trial judge, racial discrimination in the selection of grand jury, denial of self-representation, denial of public trial, and defective reasonable doubt instruction].) Structural errors " 'are those that go to the very construction of the trial mechanism—a biased judge, total absence of counsel, the failure of a jury to reach any verdict on an essential element.' " (*Avitia v. Superior Court* (2018) 6 Cal.5th 486, 495–496.)

Instructional errors are structural or reversible per se when they " 'categorically " 'vitiat[e] *all* the jury's findings' " ' " (*Mil*, *supra*, 53 Cal.4th at p. 412), and the effect on the verdict is " ' "necessarily unquantifiable and indeterminate." ' [Citation.]" (*People v. Aranda* (2012) 55 Cal.4th 342, 364 (*Aranda*).) For example, an "instruction that effectively lowers the prosecution's burden of proving guilt beyond a reasonable doubt is structural error because it 'vitiates *all* the jury's findings' and its effect on

the verdict is 'necessarily unquantifiable and indeterminate.' [Citations.]" (*Id.* at p. 365; *Hedgpeth v. Pulido* (2008) 555 U.S. 57, 61 [harmless-error analysis applies to instructional errors so long as the error at issue does not categorically " ' "vitiat[e] *all* the jury's findings" ' "].)

Here, the trial court's refusal to instruct on involuntary intoxication, like most instructional errors, is subject to harmless error analysis. (See, e.g., *Gonzalez, supra,* 5 Cal.5th at p. 199 [failure to instruct on affirmative defense and lesser included offenses subject to harmless error review]; *Mil, supra,* 53 Cal.4th at p. 414 [omission of elements of special circumstance instruction subject to harmless error review]; *Aranda, supra,* 55 Cal.4th at p. 364 [omission of standard reasonable doubt instruction in connection with gang charge subject to harmless error review].)

Indeed, even where, as here, involuntary unconsciousness would be a complete defense to a murder charge, courts have held the failure to instruct on the defense is subject to harmless error review.[4] (*Mathson, supra,* 210 Cal.App.4th at p. 1301

---

[4] Voluntary intoxication is not a complete defense to homicide. "When a person renders himself or herself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his or her negligence in self-intoxicating to that point, and is treated as involuntary manslaughter. 'Unconsciousness is ordinarily a complete defense to a charge of criminal homicide. [Citation.] If the state of unconsciousness results from intoxication voluntarily induced, however, it is not a complete defense.' " (*People v. Ochoa* (1998) 19 Cal.4th 353, 423.) "The question of whether intoxication is voluntary or involuntary focuses on whether the intoxication is induced through the defendant's fault or the fault of another or whether the defendant

[instruction on CALCRIM No. 3425, unconsciousness, was flawed, but harmless error].) For example, in *People v. Boyer* (2006) 38 Cal.4th 412 (*Boyer*), our high court held that, in a capital murder trial, the trial court's failure to instruct on the "complete defense of unconsciousness" was harmless. (*Id.* at p. 470.) As in this case, the jury was instructed on voluntary intoxication but was not instructed on the defendant being intoxicated for reasons outside of his control. (*Id.* at p. 471.) *Boyer* considered the failure to instruct on the "complete defense of unconsciousness" under the harmless error test. (*Id.* at p. 470.) The court found the error harmless because of the ample evidence that the defendant committed the murder and was conscious. (*Ibid.*) We find no reason to depart from the analysis employed in *Boyer*.

Crawley acknowledges that errors rarely fall outside of harmless error review, yet he asserts that this is such a case. He cites the Ninth Circuit Court of Appeals for the proposition that "[t]he right to have the jury instructed as to the defendant's theory of the case is one of those rights 'so basic to a fair trial' that failure to instruct where there is evidence to support the instruction can never be considered harmless error." (*United States v. Escobar de Bright* (9th Cir. 1984) 742 F.2d 1196, 1201.) Here, however, the jury was instructed on Crawley's general theory of the case, namely that he was not responsible because he

---

knows or has reason to anticipate the intoxicating effects of the substance he or she ingests. If intoxication is the result of the defendant's own fault or the defendant knows or has reason to anticipate the intoxicating effects, the intoxication is voluntary." (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1313 (*Mathson*).)

13

was unconscious.  This was covered by a portion of the voluntary intoxication instruction: "The People have the burden of proving beyond a reasonable doubt that the defendant was not unconscious.  If the People have not met this burden, you must find the defendant not guilty of murder."

Crawley also cites *People v. James* (2015) 238 Cal.App.4th 794, for the point that "[w]here a defendant provides evidence of involuntary unconsciousness, 'the refusal of a requested instruction on the subject, and its effect as a complete defense if found to have existed, is prejudicial error.  [Citations.]' [Citation.]" (*Id*. at p. 804.)  For this proposition, *James* cited *People v. Newton* (1970) 8 Cal.App.3d 359, which reasoned: "Where evidence of involuntary unconsciousness has been produced in a homicide prosecution, the refusal of a requested instruction on the subject, and its effect as a complete defense if found to have existed, is prejudicial error." (*Id*. at p. 377.) Neither case held that error in failing to instruct on involuntary unconsciousness is reversible per se.  *James* referred to *prejudicial* error (*James*, at p. 804), and the *Newton* court applied *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) in determining that the error was prejudicial and required reversal in that case. (*Newton*, at p. 378.)  Moreover, the two cases are distinguishable from the one before us.  In both *James* and *Newton*, the jury was not instructed on *any* theory of unconsciousness.  (*James*, at p. 802; *Newton*, at p. 377.)  Further, in *Newton*, the jury was instructed on diminished capacity and found the defendant guilty of only voluntary manslaughter, suggesting a reasonable probability that the jury may have believed the defendant's testimony and accepted a complete defense of unconsciousness had it been available. (*Newton*, at pp. 375, 378.)

14

Here, the jury *did* determine the material issue of Crawley's consciousness. This case is therefore closer to *Boyer*, in which our high court was concerned with the "*complete defense* of unconsciousness" and the argument that the failure to instruct on it "violated [the defendant's constitutional] rights to have the jury consider every material fact presented by the evidence." (*Boyer*, *supra*, 38 Cal.4th at p. 468.) Yet, *Boyer* found any error subject to harmless error analysis. We follow its precedent. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

In sum, any error only deprived the jury of determining whether the asserted intoxication was involuntary, rather than voluntary. This error would not affect the fairness or reliability of the entire trial. (*Anzalone*, *supra*, 56 Cal.4th at pp. 554–555.) The trial court's refusal to instruct on involuntary intoxication is subject to review for prejudicial error. (*Boyer*, *supra*, 38 Cal.4th at p. 471.)

### C. Any instructional error was harmless under any standard

We need not decide whether the trial court erred in denying Crawley's request for an involuntary intoxication instruction. The record establishes that, even if the court erred, any error was harmless, under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 [federal constitutional error is reversible unless it was harmless beyond a reasonable doubt]; accord, *People v. Schuller* (2023) 15 Cal.5th 237, 244 [*Chapman* requires reversal unless the court concludes no rational juror could have had reasonable doubt regarding the findings necessary to convict absent the instructional error]; *Watson*, *supra*, 46 Cal.2d at p. 837 [state law error is reversible if it is reasonably probable that the

15

defendant would have obtained a more favorable result without the error].)

The failure to give a jury instruction is harmless where " 'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions.  In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant . . . .' " (*People v. Wright* (2006) 40 Cal.4th 81, 98; accord, *People v. Lujano* (2017) 15 Cal.App.5th 187, 195–196 ["Omission of an instruction is harmless beyond a reasonable doubt if ' "the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions." ' "].)

*Boyer* is again instructive.  In that case, the defendant was charged with murder, among other crimes.  (*Boyer*, *supra*, 38 Cal.4th at p. 418.)  The defense offered evidence that the defendant had consumed alcohol, a PCP cigarette, and cocaine before the murder.  (*Id.* at p. 423.)  A doctor testified that the defendant may have hallucinated.  A pharmacist testified that PCP separates the consciousness from the body and can produce hallucinations and delusions.  (*Id.* at p. 424.)  At trial, the jury was instructed that "if, while unconscious as the result of voluntary intoxication, [the defendant] killed without malice or intent to kill, the crime was not murder, but involuntary manslaughter." (*Id.* at p. 468.)  The court also instructed the jury to consider the effect of the defendant's voluntary intoxication when determining whether he formed the requisite intent for the charged specific intent crimes.  (*Ibid.*)

16

On appeal, the defendant contended the trial court erred in failing to instruct sua sponte on the complete defense of unconsciousness. He argued there was substantial evidence that he killed the victims while he was hallucinating, and was therefore unconscious, "for reasons not related to the immediate effects of voluntary intoxication—including the lingering effects of chronic drug abuse and past head injuries." (*Boyer*, *supra*, 38 Cal.4th at p. 469, italics omitted & fn. omitted.) The California Supreme Court concluded that if error occurred, it was harmless under any standard. In addition to describing the strong evidence that the defendant executed the killings while conscious, the court considered the jury's rejection of the voluntary intoxication theory.

The *Boyer* court reasoned: "[T]he jury was instructed that 'voluntary' intoxication warranted a verdict of involuntary manslaughter, rather than murder. While the instructions did not specify what the jury should do if it found he was unconscious for reasons *beyond his control*, such as brain damage, it is inconceivable the jury would believe that, in such a circumstance, it should (1) convict him of *murder*, a crime *greater* than manslaughter, then (2) find true special circumstances rendering him death-eligible, then (3) sentence him to death. [Citation.] The only logical inference is that the jury rejected defendant's claim of unconsciousness entirely. Hence, an instructional failure to explain the jury's duty in the event it found *involuntary* unconsciousness can have caused no prejudice." (*Boyer*, *supra*, 38 Cal.4th at p. 471, fn. omitted.)

In *People v. Heard* (2003) 31 Cal.4th 946 (*Heard*), the defendant was charged with murder and several sex crimes, including raping the victim, which required specific intent. (*Id.*

17

at p. 950.) The primary defense theory of the case was that the defendant committed the underlying conduct but lacked the requisite mental state for the charged crimes due to being impaired from alcohol and cocaine consumption. (*Id*. at p. 956.) The jury was instructed that it had to find the defendant acted with specific intent and that it should consider whether he was intoxicated in determining whether he acted with the required mental state. The jury determined the defendant had the required mental state, despite his having consumed drugs and alcohol. However, on appeal, the defendant argued the trial court should have instructed the jury on involuntary manslaughter, based on defense evidence offered at trial that he was suffering from the combined effects of alcohol and cocaine, and therefore could have been unaware of and unable to control his behavior. (*Id*. at p. 981.)

Our high court rejected this argument, concluding in part that even if the trial court erred, the error was harmless. In convicting the defendant of the charged sexual offenses, "the jury necessarily determined that defendant formed the requisite specific intent despite his consumption of drugs and alcohol." (*Heard*, *supra*, 31 Cal.4th at p. 982.) As a result, "the jury could not have concluded he was unconscious and therefore guilty only of involuntary manslaughter. Thus, even if the court had erred in its instructions, we would find that such error was clearly harmless." (*Ibid*.)

Likewise, in *People v. Barrick* (1982) 33 Cal.3d 115, the jury was instructed to consider evidence that the defendant was intoxicated from a combination of alcohol, marijuana, and PCP at the time he stole a car, to determine whether he had the specific intent to commit theft and unlawful driving or taking of a vehicle.

(*Id*. at pp. 120, 133.) The court reasoned that "[b]y finding defendant guilty of the charged offense, the jury necessarily rejected defendant's claim that he was unconscious due to intoxication." (*Id*. at p. 133.)

In this case, the jury was instructed with CALCRIM No. 626 on voluntary intoxication causing unconsciousness. The instruction given here stated that to find voluntary intoxication causing unconsciousness, the jury must find: "As a result of voluntary intoxication, the defendant was not conscious of (his/her) actions or the nature of those actions." Critically, it went on to instruct: "The People have the burden of proving beyond a reasonable doubt that the defendant was not unconscious. If the People have not met this burden, you must find the defendant not guilty of murder." The jury found Crawley guilty of second degree murder. Thus, "[t]he only logical inference is that the jury rejected defendant's claim of unconsciousness entirely. Hence, an instructional failure to explain the jury's duty in the event it found *involuntary* unconsciousness can have caused no prejudice." (*Boyer*, *supra*, 38 Cal.4th at p. 471, fn. omitted.)

As in *Boyer*, it is inconceivable that, had the jury found Crawley was unconscious for reasons beyond his control, it would have convicted him of murder, a crime greater than manslaughter. Further, the jury's verdict finding Crawley guilty of second degree murder established it concluded the People met their burden of proving beyond a reasonable doubt that the defendant was "not unconscious." (CALCRIM No. 626; *People v. Gana* (2015) 236 Cal.App.4th 598, 611.) Any error in the court's refusal to instruct on involuntary intoxication was harmless under any standard of prejudice.

We therefore also reject Crawley's argument that he was deprived of the effective assistance of counsel because his trial attorney failed to know the relevant law regarding involuntary intoxication. Crawley cannot establish that any error by defense counsel in advocating for the involuntary intoxication instruction prejudiced him. As explained above, the jury rejected the defense's theory that Crawley was unconscious when he killed Harris. Thus, any deficient performance on the part of counsel with respect to the involuntary intoxication instruction did not prejudice the defense. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)[5]

## II. The Trial Court Did Not Abuse Its Discretion or Violate Crawley's Constitutional Rights By Admitting Gang Evidence

Crawley also argues that the trial court erred by denying his request to exclude gang evidence under Evidence Code section 352. We disagree.

Under Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ." We

---

[5] Although we need not decide the issue, we note Crawley also fails to demonstrate that counsel's performance was deficient. The record reflects that defense counsel knew the relevant law on involuntary intoxication. In arguing for the involuntary intoxication instruction, defense counsel distinguished *Velez*. Counsel articulated why *Velez* should not preclude the requested instruction and also referred to the facts of a second relevant involuntary intoxication case, *People v. Scott* (1983) 146 Cal.App.3d 823. Given this record, Crawley has not established that counsel was not reasonably competent.

20

review claims of error under Evidence Code section 352 for an abuse of discretion. (*People v. Chhoun* (2021) 11 Cal.5th 1, 29 (*Chhoun*).) Under this standard, we do not reverse a trial court unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*Id.* at p. 26.) Where a trial court does not abuse its discretion under state law, a defendant's constitutional claims also fail. (*Ibid.*)

"The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense." (*Chhoun*, *supra*, 11 Cal.5th at p. 31.) " 'Evidence of the defendant's gang affiliation— including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.' [Citation.] Even when it is relevant, however, 'courts should carefully scrutinize evidence of a defendant's gang membership because such evidence "creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged." ' [Citations.]" (*Ibid.*; accord, *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 772.)

"Common gang motives include 'criminal activity against a rival . . . or a suspected rival . . . [and] retaliation for a prior attack upon a gang member . . . .' [Citation.]" (*People v. Huynh* (2021) 65 Cal.App.5th 969, 980–981.) Evidence of the " 'concept of payback within gang culture' [citation] ha[s] been found relevant to show motive and intent in murders committed for the benefit of a gang." (*Id.* at p. 981.)

21

Crawley argues that the gang evidence was only minimally probative of motive. He asserts there was no evidence he was currently a gang member such that his gang loyalty motivated him to kill Harris. However, there was ample evidence that Crawley was still associated in some respect with the Rolling 20's Crips. On his first night in Long Beach he stayed with a gang member who loaned him a gun. The day of the murder, he wore a t-shirt with the names of deceased Rolling 20's Crips members, the gang's colors, and the gang's symbol. He also visited Spillman's father to pay his respects. Spillman was a member of the Rolling 20's Crips. Crawley visited gang members at the park and went to a street to drink and hang out with old friends, which included people affiliated with the Rolling 20's Crips. When he was arrested, Crawley was in Daynara's car (one of the three people he traveled to Long Beach to visit), and she was wearing clothing with the Rolling 20's Crips colors and affiliated symbols. Even if, as Crawley asserts, he was no longer an "active" gang member, there is certainly evidence that he still associated with Rolling 20's Crips.

Crawley also argues there was no evidence an Insane Crips member killed Spillman. But the evidence regarding Spillman's death suggested Crawley's possible motive in killing Harris. There was evidence Harris was an Insane Crips member in his youth and was still associated with the gang to the extent that he was wearing a Raider's jacket at the time of his murder. There was also evidence that the Insane Crips and Rolling 20's Crips were long-standing rivals. Spillman, a Rolling 20's Crips member, was killed two years earlier, on the same day, at nearly the exact time, and in the same way, as Crawley shot Harris. This similarity, accompanied by the evidence that gang members

22

often retaliate on anniversaries, was probative of Crawley's motive in killing Harris. The "gang affiliation evidence gave context to the shooting" (*People v. Duong* (2020) 10 Cal.5th 36, 64), and was a counterpoint to the defense theory that Crawley killed Harris simply because he was under the influence of PCP.

Crawley relies on *People v. Cardenas* (1982) 31 Cal.3d 897 (*Cardenas*), and *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*), to support his argument that the gang evidence was improperly admitted. Yet, both cases are materially different from the case at bar.

In *Cardenas*, the defendant was charged with robbing a 7-Eleven store. The issue at trial was whether the defendant was the perpetrator. (*Cardenas*, *supra*, 31 Cal.3d at p. 901.) He denied any involvement, and several witnesses testified on his behalf, supporting his alibi. (*Id.* at pp. 902–903.) The prosecution attacked the credibility of those witnesses by eliciting testimony that the witnesses and the defendant were in the same gang. (*Id.* at p. 903.) The *Cardenas* court held that the probative value of the gang evidence was "minimal at best" because it was offered only to show the bias of the defense witnesses in favor of the defendant, and the prosecution had already "amply established" that they all lived in the same neighborhood and were friends. (*Id.* at p. 904.) Evidence about hostilities between the defendant's gang and another gang was irrelevant. (*Id.* at p. 905.) Further, although the prosecution did not offer evidence indicating the crime was gang-related, the prosecutor pursued a line of questioning that suggested the attempted robbery was a gang operation and that the gang was generally involved in criminal activities. (*Id.* at pp. 905–906.) The *Cardenas* court concluded the trial court erred in admitting the gang evidence

because it was not probative and the prosecutor's improper questions "made it a near certainty that the jury viewed appellant as more likely to have committed the violent offenses charged against him" because of his gang membership.  (*Id*. at p. 906.)

In *Albarran*, a jury convicted the defendant of crimes relating to a shooting at a party and a subsequent carjacking.  (*Albarran, supra*, 149 Cal.App.4th at pp. 217–218.)  Although the defendant was charged with a gang enhancement, the prosecutor admitted there was no percipient witness or evidence to prove the crime was gang-related or motivated.  (*Id*. at p. 219.)  As in *Cardenas*, the defendant presented an alibi.  (*Id*. at p. 222.)  At trial, the only evidence the prosecution presented to show the shooting was gang-related was that it occurred in Palmdale, at a party, and involved more than one shooter.  (*Id*. at pp. 220–221.)  The trial court allowed gang evidence, which included that the defendant was a member of a gang, and descriptions of the gang's activities, including threats against police officers and an ongoing gang "war."  (*Ibid*.)  Among other things, the prosecution argued that the defendant's alibi was unbelievable because he was a gang member.  (*Id*. at p. 222.)

The Court of Appeal concluded the gang evidence was irrelevant and prejudicial.  It reasoned, "[t]here is nothing inherent in the facts of the shooting to suggest any specific gang motive.  In the final analysis, the only evidence to support the respect motive is the fact of Albarran's gang affiliation." (*Albarran, supra*, 149 Cal.App.4th at p. 227, fn. omitted.)  "Even if we were to conclude that evidence of Albarran's gang membership and some evidence concerning gang behavior were relevant to the issue of motive and intent, other extremely

24

inflammatory gang evidence was admitted, which had no connection to these crimes.  The prosecution presented a panoply of incriminating gang evidence, which might have been tangentially relevant to the gang allegations, but had no bearing on the underlying charges."  (*Ibid*.)

In contrast to *Cardenas* and *Albarran*, the gang evidence here was probative of motive and intent.  It provided a specific reason why Crawley may have shot Harris, as opposed to simply suggesting he committed a crime because he was a gang member.  Moreover, in contrast to *Cardenas* and *Albarran*, there was significantly less risk of prejudice here.  As our high court has " 'repeatedly explained,' " under Evidence Code section 352 "prejudicial" is not synonymous with "damaging."  (*Chhoun*, *supra*, 11 Cal.5th at p. 29.)  Rather, the prejudice Evidence Code section 352 seeks to avoid is that which uniquely tends to evoke an emotional bias against the defendant and which has very little effect on the issues.  (*Ibid*.)  It was undisputed that Crawley shot Harris in the head.  Indeed, the jury was shown a video of the murder.  The gang evidence did not run the risk of suggesting that Crawley was guilty of a crime simply because he was a gang member.

Further, the gang evidence was not highly inflammatory.  Most of the evidence concerned various individuals' gang affiliations, why gang anniversaries are relevant, and the ties between Spokane and Long Beach for Rolling 20's Crips gang members.  This was probative of Crawley's gang membership and motive.  The expert briefly mentioned that he had "responded to several violent crimes" involving the Rolling 20's Crips and their rivals, the Insane Crips, in order to establish his expertise on the two gangs.  This general testimony was less prejudicial than the

evidence showing Crawley shooting Harris in the head. (*Chhoun*, *supra*, 11 Cal.5th at p. 29 [no abuse of discretion where evidence of gang crime was less inflammatory than the charged crime].) Nor was there any wholly irrelevant, incendiary evidence here about the gang's violence.

Crawley asserts that by questioning him about the names listed on his t-shirt and whether they were killed by Insane Crips, the People prejudicially associated him with violence. But the People did not question Crawley about violence by *his* gang, nor did the gang expert discuss any specific violence committed by the Rolling 20's Crips. While the prosecutor's questions about the names on the shirt did not prove particularly probative, this line of questioning was not prejudicial because it did not elicit any answers from Crawley about how the individuals were killed, thus failing to suggest the deaths were the result of the Rolling 20's and Insane Crips rivalry. Crawley did not know the circumstances surrounding the individuals' deaths.

Crawley additionally argues that the gang expert was permitted to testify to matters "far afield." He refers to photos of his gang tattoos that were shown to the jury, which he received when he was 18 years old, and the gang expert's testimony that there are Rolling 20's Crips members in Spokane and a bad gang problem there, without identifying a timeframe. However, this evidence was probative of Crawley's association with the Rolling 20's Crips and his motive, and was related to more current evidence of his gang association. We cannot conclude that this evidence was so far afield that the trial court abused its discretion in admitting it. (E.g., *People v. Williams* (1997) 16 Cal.4th 153, 194 [evidence of gang behavior and areas of influence is probative in gang cases].)

Finally, Crawley relies on *People v. Bojorquez* (2002) 104 Cal.App.4th 335, to argue that the gang expert's testimony in this case was too broad. In *Bojorquez*, the defendant testified at trial. In that testimony, he admitted his gang membership but denied that he had previously admitted to law enforcement that he was in a gang. The defendant also denied being an active gang member at the time of the crime. A gang expert subsequently testified, providing evidence to impeach the defendant's testimony. But the expert also provided wide-ranging testimony about gangs in Long Beach and their criminal activities. On appeal, the court concluded the evidence relevant to impeach the defendant was properly admitted, but the additional gang evidence was not. (*Id*. at pp. 344–345.) The additional gang evidence was of "minimal, if not nonexistent" probative value, and the *Bojorquez* court reasoned that "[e]rroneous admission of gang-related evidence, particularly regarding criminal activities, has frequently been found to be reversible error, because of its inflammatory nature and tendency to imply criminal disposition, or actual culpability." (*Id*. at pp. 343, 345.)

Here, in contrast, there was no extraneous gang evidence. The gang evidence was probative of motive, a central issue in the case. Given the undisputed video evidence that Crawley killed Harris, the gang evidence did not prejudicially suggest Crawley was guilty of the crime merely because he was associated with a gang. The trial court did not abuse its discretion.

## III.   **Crawley Has Not Established Sentencing Error**

Crawley asserts two sentencing errors. We reject both claims of error.

### A. Section 1170.1 error

First, Crawley contends that the sentence on count 2 violates section 1170.1. Crawley argues that because the 15-years-to-life sentence on count 1 was the "principal" term and count 2 the "subordinate" term, the trial court erred in sentencing him to the full midterm of two years on count 2, rather than the one-third of the midterm, or 8 months. (*People v. Catarino* (2023) 14 Cal.5th 748, 752.)

The trial court did not err. Section 1170.1 applies when both terms are determinate. Where, as here, a determinate sentence is consecutive to the indeterminate sentence, the determinate sentence is imposed in full and is not limited to one-third of the midterm. (*People v. Reyes* (1989) 212 Cal.App.3d 852, 856, citing *People v. Day* (1981) 117 Cal.App.3d 932, 936–937; see also *People v. Garza* (2003) 107 Cal.App.4th 1081, 1094; *People v. Lyons* (1999) 72 Cal.App.4th 1224, 1228.) "A life sentence is 'indeterminate,' i.e., not for a fixed period. When a defendant is sentenced to both a determinate and an indeterminate sentence, the determinate sentence is served first. Nonetheless, neither term is 'principal' or 'subordinate.' They are to be considered and calculated independently of one another. [Citation.] Thus, if count II is not subordinate to count I, the period of imprisonment is not limited to one-third of the midterm. The full term may be imposed." (*Reyes*, at p. 856.)

### B. Section 1385 error

Crawley also asserts that the trial court was required to dismiss the 10-year firearm enhancement pursuant to section 1385, subdivision (c)(2)(C).

Effective January 1, 2022, Senate Bill No. 81 (2021–2022 Reg. Sess.) (Senate Bill 81) amended section 1385. (Stats. 2021,

ch. 721, § 1.)  Subdivision (c)(1) now provides that "the court *shall dismiss* an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute," and subdivision (c)(2) provides that "the court *shall* consider and afford great weight" to evidence of certain enumerated mitigating circumstances.  (Italics added.)  "[T]he presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety."  (§ 1385, subd. (c)(2).)  One of those listed mitigating circumstances, section 1385, subdivision (c)(2)(C), provides: "The application of an enhancement could result in a sentence of over 20 years.  In this instance, the enhancement shall be dismissed."

As an initial matter, Crawley has forfeited his argument by failing to assert any error below.  Defense counsel did not object to the sentence on the enhancement, or any part of the sentence.  (*People v. Coleman* (2024) 98 Cal.App.5th 709, 724–725 (*Coleman*) [failure to raise Sen. Bill 81 in trial court constitutes forfeiture on appeal], quoting *People v. Carmony* (2004) 33 Cal.4th 367, 375–376 ["any failure on the part of a defendant to invite the court to dismiss under section 1385 . . . waives or forfeits his or her right to raise the issue on appeal"]; see also *People v. Velasquez* (2007) 152 Cal.App.4th 1503, 1511 ["by failing to object, Velasquez has forfeited his claim the upper terms are improper because the trial court did not state its reasons for selecting those terms"].)  Crawley has not submitted a reply brief or otherwise asserted that his argument is not forfeited.

Regardless, the argument fails on the merits.  While this appeal was pending, the California Supreme Court clarified the

29

trial court's discretion regarding section 1385, subdivision (c)(2), in *People v. Walker* (2024) 16 Cal.5th 1024, 1028 (*Walker*).[6]  The court rejected the lower court's holding that section 1385, subdivision (c)(2) created a rebuttable presumption in favor of dismissal that could only be overcome by a finding that the dismissal would endanger public safety.  (*Ibid*.)  Instead, the court reasoned that "absent a finding that dismissal would endanger public safety, a court retains the discretion to impose or dismiss enhancements provided that it assigns significant value to the enumerated mitigating circumstances when they are present.  [Citation.]  In other words, if the court does not find that dismissal would endanger public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.' [Citation.]" (*Id*. at p. 1029.)

Thus, dismissal of the enhancement was not mandatory, as Crawley contends.  Moreover, in considering the firearm enhancement, the trial court stated that it selected the high term of 10 years because of Crawley's "admission that he served a prior prison term and that he engaged in violent conduct that indicated *a serious danger to society . . . .*" (Italics added.)  Thus, the court impliedly found that dismissal of the enhancement would endanger public safety.  Crawley bears the burden of

---

[6]     *Walker*, *supra*, 16 Cal.5th 1024, was decided on August 15, 2024.  Crawley's reply brief was due on September 23, 2024.  Thus, Crawley had an opportunity to explain the impact of *Walker* on his argument.

30

establishing that the trial court misunderstood its sentencing discretion when it did not strike his firearm enhancement. "We assume the trial court was aware of and followed applicable law." (*Coleman, supra*, 98 Cal.App.5th at p. 724.) Crawley has not met this burden.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EGERTON, Acting P. J.

HANASONO, J.*

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.